# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

JASON D.,[1]

                    Plaintiff,

   vs.

ANDREW SAUL,
Commissioner of Social Security,

                   Defendant.

Case No. 3:19-CV-00176-SLG

## DECISION AND ORDER

On or about January 9, 2013, Jason D. protectively filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2] alleging disability beginning January 29, 2009.[3] Mr. D. has exhausted his administrative remedies and filed a Complaint seeking relief from this Court.[4] Mr. D.'s opening brief asks the Court to reverse and remand the agency decision.[5] The Commissioner filed an Answer and a

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Jason D. brought a claim under only Title II. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).

[3] Administrative Record ("A.R.") 128, 734. The application lists January 10, 2013. A.R. 128.

[4] Docket 1 (Jason D.'s Compl.).

[5] Docket 15 (Jason D.'s Br.).

brief in opposition to Mr. D.'s opening brief.[6]  Mr. D. filed a reply brief on December 27, 2019.[7]  Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8]  For the reasons set forth below, Mr. D.'s request for relief will be denied.[9]

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[10] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[12]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts

---

[6] Docket 11 (Answer); Docket 16 (Defendant's Br.).

[7] Docket 17 (Reply).

[8] 42 U.S.C. § 405(g).

[9] Due to the coronavirus pandemic, by Miscellaneous General Order 20-11, the District of Alaska imposed a stay of all civil matters for 30 days, effective March 30, 2020.  As the presiding judge in this matter, the undersigned judge vacates the stay in this case to enter this order, allow entry of final judgment, and the filing of any post-judgment motions.  *See* MGO-20-11 at 6-7.  However, the parties may move or stipulate to extend any filing deadlines.

[10] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[11] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[12] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

from the administrative law judge ("ALJ")'s conclusion.[13]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[14]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [he] did not rely."[15]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[16]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[17]  In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[18]

//

//

---

[13] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[14] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[15] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[16] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[17] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[18] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

## II.    DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[19]  In addition, Supplemental Security Income (SSI) may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[20]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[21]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[22]

---

[19] 42 U.S.C. § 423(a).

[20] 42 U.S.C. § 1381a.

[21] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[22] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[23]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[24]  If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[25]  The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[26]  The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**  Determine whether the claimant is involved in "substantial gainful activity."[27]  *The ALJ concluded that Mr. D. had not engaged in substantial gainful activity during the period from his alleged onset date of January 29, 2009 through his date last insured of December 31, 2014.*[28]

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the

---

[23] 20 C.F.R. § 404.1520(a)(4).

[24] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[25] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[26] *Tackett*, 180 F.3d at 1101.

[27] 20 C.F.R. § 404.1520(a)(4)(i).

[28] A.R. 737.

twelve-month duration requirement.[29]  *The ALJ determined that Mr. D. had the following severe impairments: status post SLAP repair right shoulder; status post left elbow ulnar nerve transposition; and status post right elbow debridement with epicondyle release. The ALJ determined that Mr. D.'s cervical spine degenerative disc disease; anxiety syndrome; and a possible somatic related disorder were non-severe impairments.[30]*

**Step 3.**  Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.[31]  If not, the evaluation goes on to the fourth step.  *The ALJ determined that Mr. D. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[32]*

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[33] *The ALJ concluded that Mr. D. had the RFC to perform light work as defined in 20 CFR*

---

[29] 20 C.F.R. § 404.1520(a)(4)(ii).

[30] A.R. 737.

[31] 20 C.F.R. § 404.1520(a)(4)(iii).

[32] A.R. 738.

[33] 20 C.F.R. § 404.1520(a)(4).

*404.1567(b), except that he was additionally limited to: occasionally pushing and pulling 10 pounds with the bilateral upper extremities; frequently climbing ramps or stairs; frequently balancing, stooping, kneeling, and crouching; occasionally crawling; never climbing ladders, ropes, or scaffolds; occasionally reaching with the bilateral upper extremities; never reaching overhead with the bilateral upper extremities; frequently handling with the bilateral upper extremities; occasionally fingering and feeling with the bilateral upper extremities; avoiding concentrated exposure to non-weather related extreme cold, extreme heat, wetness, humidity, excessive noise and fumes; avoiding all exposure to excessive vibration and unprotected heights; and only occasionally being exposed to moving and hazardous machinery.*[34]*

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do his past relevant work, the claimant is deemed not to be disabled.[35] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ found that Mr. D. was not capable of performing any past relevant work.*[36]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the

---

[34] A.R. 739.

[35] 20 C.F.R. § 404.1520(a)(4)(iv).

[36] A.R. 745.

RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.[37]  *The ALJ determined that there were other jobs existing in the national economy that Mr. D. was able to perform, including call out operator; surveillance system operator; and semiconductor monitor.[38]*

The ALJ concluded that Mr. D. was not disabled from January 29, 2009, the alleged onset date, through December 31, 2014, the date last insured.[39]

## III.    PROCEDURAL AND FACTUAL BACKGROUND

Mr. D. was born in 1966; he is 53 years old.[40]  Mr. D. reported working as a lawn mower repair person, construction worker, carver, and tattoo artist in the past.[41]  On April 30, 2013, the Social Security Administration ("SSA") determined that Mr. D. was not disabled under the applicable rules.[42]  On December 4, 2013, Mr. D. appeared and testified without representation at a hearing held before ALJ Paul Hebda.[43]  On May 22, 2014, the ALJ issued an unfavorable ruling.[44]  On October 2, 2015, the Appeals Council

---

[37] 20 C.F.R. § 404.1520(a)(4)(v).

[38] A.R. 745–46.

[39] A.R. 746.

[40] A.R. 128.

[41] A.R. 157–59, 194, 745, 967.  Although Mr. D. reported performing limited work as a tattoo artist at his hearing on December 4, 2013, there was no further evidence of income posted after 2009. A.R. 35–36, 737, 967.

[42] A.R. 64.

[43] A.R. 35–47.

[44] A.R. 9–22.

denied Mr. D.'s request for review.[45]  On November 2, 2015, Mr. D. appealed to this Court.[46]  On March 31, 2017, this Court vacated the Commissioner's final decision and remanded for further administrative proceedings.[47]  On remand, the ALJ held a new hearing on May 4, 2018 at which Mr. D. appeared with representation.[48]  The ALJ issued a new decision on June 15, 2018.[49]  The Appeals Council denied Mr. D.'s request for review of the ALJ's new decision on April 26, 2019.  The Appeals Council noted, "[w]hile some medical sources indicated the need for additional testing and evaluation, this case involves a Title II claim with a remote period at issue from January 29, 2009 through December 31, 2014; therefore, additional development would not relate to the period at issue."  The Appeals Council also determined that the ALJ "considered [Mr. D.]'s subjective complaints of side effects related to his medication, activities of daily living, and the objective medical evidence in evaluating [Mr. D.]'s subjective complaints in accordance with Social Security Ruling 16-3p" and that the record did not reflect "complaints of memory loss, problems with concentration, dizziness, sleepiness, or any

---

[45] A.R. 1–5.

[46] A.R. 802–05.

[47] A.R. 851.

[48] A.R. 757–98.

[49] A.R. 731–46.

other side effect from [Mr. D.]'s medication."[50]  On June 21, 2019, Mr. D. appealed to this Court; he is represented by counsel in this appeal.[51]

*Medical Records and Medical Opinion Evidence*

Although Mr. D.'s medical records date back to October 2006, the Court focuses on the relevant medical records[52] after the alleged onset date of January 29, 2009 through December 31, 2014, the date last insured.  However, the Court notes the following relevant record from before the application date: On April 4, 2008, Mr. D. saw David Werner, M.D., at Valley Medical Center in Palmer, Alaska.  Dr. Werner diagnosed Mr. D. with panic attacks "starting a year and a half ago."  He prescribed Klonopin.[53]  Dr. Werner's  also noted right shoulder pain and right elbow pain related to Mr. D/s prolonged work as a carver.[54]

The following are the relevant records after January 29, 2009:

On February 2, 2009, Mr. D. saw Mark Clyde, M.D., at Denali Orthopedic Surgery in Palmer, Alaska.  He reported elbow to shoulder pain with tingling in his fingers, both stemming from his continuous use of power tools at work.  On physical examination, Dr.

---

[50] A.R. 724–25.

[51] Docket 1.

[52] There are multiple duplicate treatment notes in the Court's record.  To the extent possible, the Court cites the first treatment note to appear in the medical record.

[53] Clonazepam (Klonopin) is used alone or in combination with other medications to control certain types of seizures.  It is also used to relieve panic attacks and is in a class of medications called benzodiazepines, which decrease abnormal electrical activity in the brain, https://medlineplus.gov/druginfo/meds/a682279.html (last visited March 22, 2020).

[54] A.R. 550, 1037.

Clyde observed that Mr. D. had active flexion and extension of all of his fingers and thumb; good wrist flexion and extension; "pain up around the medial epicondyle and in the soft tissues of the flexor pronator mass proximally in the forearm"; tenderness and numbness over the cubital tunnel; and shoulder pain. Dr. Clyde also observed that Mr. D. could lift his arm above his head and had good arm strength with 80 degrees of both external and internal rotation. Dr. Clyde diagnosed Mr. D. with medical epicondylitis; cubital tunnel syndrome; and shoulder pain. Dr. Clyde opined that Mr. D. could perform light duty work with "[n]o heavy lifting, pushing, [or] pulling."[55]

On February 16, 2009, Mr. D. had x-rays of his right shoulder and right elbow. The right shoulder x-ray showed type II acromion; no signs of calcific tendonitis; no fracture; and some narrowing of the glenohumeral joint. The elbow x-ray showed a normal elbow.[56] Based on the x-rays, Dr. Clyde assessed Mr. D. with right shoulder impingement; medial and lateral epicondylitis; and cubital tunnel syndrome. He recommended steroid injections.[57] Dr. Clyde again approved return to light duty with no overhead lifting.[58]

On March 2, 2009, Mr. D. followed up with Dr. Clyde. On physical examination, Dr. Clyde observed no point tenderness over the lateral or medial epicondyle. Dr. Clyde recommended that Mr. D. stop his carving work for one month to see if he could recover.[59]

---

[55] A.R. 489, 599–600.

[56] A.R. 634.

[57] A.R. 599.

[58] A.R. 490.

[59] A.R. 491, 598.

On March 4, 2009, Mr. D. initiated care with Excel Physical Therapy. He reported taking two weeks off work and feeling "very good," but that upon his return to work he also had a return of his signs and symptoms. On examination, Mr. D. had a positive bilateral Hawkins Kennedy test for impingement; a positive golfer's elbow on the left side; tennis elbow on the right side; a positive speeds test on the right; negative Spurlings and reverse Spurlings tests; and 5/5 muscle strength in the upper extremities.[60]

On March 30, 2009, Mr. D. followed up with Dr. Clyde. Mr. D. reported that emptying the dishwasher caused him shoulder pain and that he continued to have pain running down his arms. On physical examination, Mr. D. had "difficulty raising his shoulder or arm above 90 degrees," but Dr. Clyde could passively elevate and rotate Mr. D.'s arm internally and externally. Dr. Clyde recommended an EMG and nerve conduction study of the upper extremities.[61]

On April 6, 2009, Mr. D. followed up with Dr. Clyde after an MRI of his right shoulder and an EMG and nerve conduction study. The MRI showed some undersurface or partial tear of the supraspinatus tendon going back towards the infraspinatus, but no retraction and no complete tear; normal subscapularis and biceps; minimal signal in the area of the superior labrum; and type I acromion, mild degenerative joint disease of the acromioclavicular joint. The EMG and nerve conduction study revealed moderate left cubital tunnel syndrome and mild right cubital tunnel syndrome, but no median nerve

---

[60] A.R. 651–53. Mr. D. followed up with Excel Physical Therapy on March 27, 2009. A.R. 649–50.

[61] A.R. 492, 597.

neuropathy and no cervical radiculopathy.[62]  Dr. Clyde recommended light duty work with no heavy lifting, pushing, or pulling and no repetitive motion in the elbow or wrist for two months, but office work was "okay."[63]

On April 28, 2009, Mr. D. underwent an anterior transposition of the ulnar nerve on the left.[64]

On May 4 and 11, 2009, Mr. D. followed up with Dr. Clyde.  He reported his "only complaint" was numbness around the point of his elbow after surgery and that he continued to have right shoulder pain.  Dr. Clyde observed that Mr. D. had full extension but not full flexion of his elbow; could actively flex and extend his fingers; and had good strength in his little and ring finger flexors.[65]  Dr. Clyde recommended no heavy lifting for four weeks and strengthening of the elbow at six weeks postoperative.[66]

On June 8, 2009, Mr. D. followed up with Dr. Clyde.  He reported that his numbness had resolved.  On physical examination, Dr. Clyde observed full extension and flexion of the elbow.  Mr. D. wanted to proceed with shoulder surgery on his right shoulder.[67]  Dr.

---

[62] A.R. 344–50, 537–38, 596.

[63] A.R. 493.

[64] A.R. 628–30.

[65] A.R. 594.

[66] A.R. 496.

[67] A.R. 593.

Clyde recommended beginning light duty work with no lifting, pushing, or pulling over 10 pounds.[68]

On July 22, 2009, Mr. D. underwent right shoulder arthroscopy. Dr. Clyde noted a degenerative SLAP lesion with detachment of the biceps proximally. Dr. Clyde performed a SLAP lesion repair, biceps tenodesis, and an acromioplasty. There was no indication of a rotator cuff tear.[69]

On July 27, 2009, Mr. D. returned to Excel Physical Therapy for post-surgery physical therapy for the right shoulder.[70]

On October 15, 2009, Mr. D. followed up with Dr. Clyde. He reported shoulder pain. On physical examination, Dr. Clyde observed forward flexion 120 degrees, abduction 105 degrees, and external and internal rotation of 45 degrees. Dr. Clyde noted that he "discussed with [Mr. D.] that the repair is now healed and he needs to work more on motion and strength."[71] Dr. Clyde recommended light duty desk work with no lifting, pushing, or pulling over 10 pounds and no overhead work.[72]

On November 4, 2009, Mr. D. followed up at Excel Physical Therapy. He reported "increased pain with any work related activity that often involves heavy lifting and

---

[68] A.R. 500.

[69] A.R. 530–32.

[70] A.R. 306–07. Mr. D. regularly followed up at Excel Physical Therapy from approximately July 27, 2009 through January 6, 2010. A.R. 309–39.

[71] A.R. 592.

[72] A.R. 502.

repetitive motions" and that "doing dishes and pushing and pulling are painful." On examination, Mr. D. had a positive golfer's elbow test on the left and right and positive tennis elbow on the right.[73]

On December 14, 2009, Dr. Clyde opined that Mr. D was not medically stable. He specified that Mr. D. had medial and lateral epicondylitis; persistent, mild elbow pain; and cubital tunnel syndrome.[74]

On January 4, 2010, Mr. D. followed up with Dr. Clyde. He reported that his shoulder was "doing good." Mr. D. indicated that he continued to have medial and lateral elbow pain in the right elbow, but his left elbow was "doing great" where the cubital tunnel was released. Dr. Clyde observed that Mr. D. could elevate his shoulder 165 degrees forward, externally rotate 85 degrees, internally rotate 80 degrees; and reach to about L5 on an internal rotation test. Dr. Clyde released Mr. D. from orthopedic care and recommended a home exercise program and surgery on his right elbow if the pain did not go away.[75] Dr. Clyde opined that Mr. D. was not medically stable and he would need a permanent impairment rating in six months, but also opined that Mr. D. could work with modifications.[76]

_____

[73] A.R. 297–98.

[74] A.R. 1065–66.

[75] A.R. 591.

[76] A.R. 366.

On January 6, 2010, Mr. D. discontinued physical therapy at Excel Physical Therapy. He reported that he needed to wait for a permanent impairment rating in six months before resuming therapy.[77]

On January 28, 2010, Mr. D. had x-rays of his right hand and right elbow. He reported pain after falling off a ladder. The x-rays showed degenerative changes at the first MTP joint and at the elbow joint, primarily olecranon spurring with no effusion or acute fracture.[78]

On February 5, 2010, Mr. D. saw Donald Schroeder, M.D., an orthopedic surgeon, for an Independent Medical Evaluation. Mr. D. reported intermittent right shoulder pain, intermittent left elbow pain, and constant right elbow pain. He reported currently receiving no formal treatment and taking no medications. Dr. Schroeder reviewed Mr. D.'s medical records and past medical and socioeconomic history. On physical examination, Dr. Schroeder observed no muscle atrophy, spasm, torticollis, skin rash, or swelling of the upper extremities. Dr. Schroeder reported that Mr. D.'s left shoulder moved with no pain, crepitation, impingement, or instability. He reported that Mr. D.'s right shoulder moved through a range of motion with slight crepitation and mild pain. Dr. Schroeder noted that Mr. D.'s active range of motion in his right shoulder measured 165 degrees flexion; 145 degrees abduction; 70 degrees external rotation; 60 degrees internal rotation; 40 degrees adduction; and 60 degrees extension. He also noted "acute tenderness over the medial

---

[77] A.R. 486.

[78] A.R. 487.

and lateral aspects of the right elbow over the epicondyles," but also noted that the Tinel's sign over the cubital tunnel and carpal tunnel were bilaterally negative. Dr. Schroeder also observed tenderness in the medial epicondyle of the left elbow, but not lateral tenderness. Dr. Schroeder noted that Mr. D.'s motor strength in the upper extremities was 5/5 with good effort. He diagnosed Mr. D. with impingement syndrome and SLAP lesion right shoulder by history; epicondylitis medial and lateral right elbow by history; medial epicondylitis left elbow by history; left cubital tunnel syndrome by history; status post SLAP repair; right shoulder acromioplasty; and status post ulnar nerve transfer on the left. Dr. Schroeder opined that Mr. D. was medically stable as of February 5, 2010. Dr. Schroeder opined that Mr. D. had a total upper extremity permanent partial impairment rating of 16 percent or a 10 percent whole person impairment. Dr. Schroeder noted that Mr. D. "expressed an interest in being a tattoo artist" and that "[t]his would seem to be a reasonable pursuit for him."[79]

On April 8, 2010, Mr. D. followed up with Dr. Clyde. He reported right lateral epicondylitis. He reported retraining as a tattoo artist, but also reported with "a full day of drawing he ha[d] significant pain" in his lateral epicondyle. Dr. Clyde recommended surgery.[80]

On May 26, 2010, Mr. D. underwent right elbow surgery.[81]

---

[79] A.R. 475–85.

[80] A.R. 590. Mr. D. followed up with Dr. Clyde again on May 17, 2010 and elected to have surgical debridement of the right elbow. A.R. 589.

[81] A.R. 468–69.

On June 7, 2010, Mr. D. followed up with Dr. Clyde.  Dr. Clyde assessed that Mr. D. was doing well after lateral epicondyle debridement.  Dr. Clyde opined that Mr. D. would be unable to work for one month.[82]

On July 1, 2010, Mr. D. followed up with Dr. Clyde.  On physical examination, Mr. D. had full extension of the elbow, full flexion, and normal pronation and supination.  Dr. Clyde recommended following up in six weeks.[83]  Dr. Clyde opined that Mr. D. could perform modified work and "[p]rogressive activity."[84]

On August 12, 2010, Mr. D. saw Dr. Clyde.  He reported an elbow locking episode with the left elbow.  On physical examination, Dr. Clyde observed that Mr. D. could go through a full range of motion of the left elbow with no locking and that Mr. D.'s right elbow was healing.  Dr. Clyde noted that Mr. D. had full extension, flexion, pronation and supination, and good strength in wrist extension.[85]  Dr. Clyde opined that Mr. D. could return to modified work with no heavy lifting, pushing, or pulling and no repetitive motion.[86]

On September 30, 2010, Mr. D. saw Dr. Clyde.  He reported bilateral shoulder pain and neck pain.  On physical examination, Dr. Clyde observed forward flexion to about 150 degrees and abduction to 150 degrees; external rotation of 80 degrees; and internal rotation of 75 degrees; decreased extension; normal lateral bend with no radicular

---

[82] A.R. 588.

[83] A.R. 588.

[84] A.R. 444.

[85] A.R. 587.

[86] A.R. 442.

symptoms; and good strength in his shoulder.[87]   Dr. Clyde opined that Mr. D. could perform modified work.[88]

On October 7, 2010, Mr. D. followed up with Dr. Clyde for shoulder and elbow pain. He reported trying to work as an apprentice tattoo artist.  Dr. Clyde commented, "I think that is a good idea."  Dr. Clyde opined that Mr. D. had reached medical stability.[89]

On November 17, 2010, Mr. D. saw Michel Gevaert, M.D., at Alaska Spine Institute for a permanent partial impairment determination.  Mr. D. reported that his shoulder was "still quite painful" and rated it between an 8 or a 9 on a pain scale from 0 to 10.  He reported pain along the right lateral epicondyle radiating into the supinator tunnel; ongoing left elbow pain, some weakness in the left hand, and occasional elbow locking.   On physical examination, Mr. D.'s shoulder flexion was 150 degrees; extension 40 degrees; abduction 110 degrees; crossover abduction 30 degrees; external rotation 80 degrees; and internal rotation 35 degrees.  His right elbow showed full extension; 125 degrees of flexion; full supination; and 80 degrees of pronation with moderate tenderness in the lateral epicondyle.  Dr. Gevaert noted atrophy of the intrinsic muscles in the left arm; 50 pounds grip strength in the right hand; and 85 pounds grip strength in the left hand.  Dr. Gevaert opined that Mr. D. had 26% upper extremity impairment and 16% whole person

---

[87] A.R. 586.

[88] A.R. 437.

[89] A.R. 585.

impairment. Dr. Gevaert also opined that Mr. D. could perform work in a light medium work category "as long as it does not involve repetitive activity."[90]

On December 27, 2010, Mr. D. followed up with Dr. Clyde for pain management. He stated he was working as a tattoo artist. Dr. Clyde told Mr. D. that he needed to seek a primary care provider for pain management.[91]

On July 25, 2011, Mr. D. followed up with Dr. Clyde. He reported "some right shoulder pain." He also reported passing his tattoo licensure test and planned to start a tattoo business. On physical examination, Dr. Clyde observed that Mr. D. had well healed surgical incisions; his shoulder went through a full range of motion with 5/5 strength; and he had no pain with resisted extension of the wrist. Dr. Clyde noted that Mr. D.'s shoulder and elbow surgeries were "doing well."[92]

On December 19, 2012, Mr. D. saw David Werner, M.D., at Valley Medical Center. He reported applying for Social Security disability for his right shoulder and both elbows. He also reported two emergency room visits for Klonopin withdrawals. Dr. Werner diagnosed Mr. D. with multiple orthopedic problems; initial panic and anxiety attacks leading to dependency on Klonopin and severe withdrawals; heavy smoking; and migraines.[93]

---

[90] A.R. 340–43.

[91] A.R. 425.

[92] A.R. 584.

[93] A.R. 1035–36.

On May 9, 2013, Mr. D. saw Dr. Clyde.  He reported right hand numbness in little, ring, and long fingers.  He also reported working as a tattoo artist.  On physical examination, Dr. Clyde observed that Mr. D. was able to elevate forward about 135 degrees, rotate externally 80 degrees, and internally rotate 80 degrees.  Dr. Clyde observed good strength in rotation; normal elbow flexion, extension, pronation, and supination; 5/5 strength of biceps and triceps; normal wrist flexion and extension; normal finger flexion and extension, abduction, and adduction; a negative cubital tunnel compression test; and a negative Phalen's test.  Dr. Clyde noted that "[b]ecause [Mr. D.] is vague in his complaints, he does not point to a specific problem, I would recommend an EMG/nerve conduction study."[94]

On May 13, 2013, Dr. Werner completed a medical form.  He opined that Mr. D. was employable.  He noted that Mr. D. started taking Klonopin in 2006 for anxiety attacks.  Dr. Werner also noted that Mr. D. "[n]ow has severe withdrawal symptoms and uses Klonopin daily."[95]

On January 29, 2014, Mr. D. saw Thomas Gritzka, M.D., an orthopedic surgeon, for an independent medical evaluation.  He reported posterior cervical pain; upper extremity pain and numbness in the upper extremities; and mid thoracic pain.  On physical examination, Dr. Gritzka observed that Mr. D.'s active and passive shoulder ranges were "somewhat discordant."  He observed that Mr. D. had mild residual right impingement

---

[94] A.R. 694.

[95] A.R. 700.

syndrome and symptoms consistent with a mild left shoulder impairment syndrome. Dr. Gritzka also noted a positive Tinel's sign over the cubital tunnel on the left and weakness on the right "consistent with either a lesion at the cubital tunnel or a cervical lesion." He noted that Mr. D. appeared to have "a significant anxiety syndrome." Dr. Gritzka also noted that Mr. D.'s "unique occupational experience has been as an artist and a carver of Alaska curios and artifacts. He probably cannot do that work at this time."[96] On the same date, Dr. Gritzka completed a medical source statement. He opined that Mr. D. was limited to lifting and carrying up to 10 pounds occasionally; sitting six hours, standing three hours, and walking one hour in an eight hour workday; never reaching overhead; occasionally reaching in all other directions; occasionally handling, fingering, feeling, and pushing/pulling on the right; never handling, fingering, feeling, or pushing/pulling on the left; and never being exposed to vibrations. Dr. Gritzka opined that Mr. D. was capable of performing his activities of daily living.[97]

On June 16, 2014, Mr. D. initiated care with Heath McAnally, M.D., at Northern Anesthesia & Pain Medicine. He reported weakness and clumsiness of both upper extremities, "so much so that he had to close his tattooing business; as he has been too shaky." He also reported falling due to weakness of the legs. On physical examination, Dr. McAnally observed a normal musculoskeletal exam; a global decreased response to tactile stimulation of the arms; decreased global response to tactile stimulation of the

---

[96] A.R. 203–10.

[97] A.R. 716–21.

leg/foot; an abnormal, wide-based antalgic gait; neck pain elicited by motion; and abnormal cervical spine motion. Dr. McAnally recommended a cervical MRI and provided medication to "palliate his symptoms." Dr. McAnally noted that Mr. D. was "fixated on the idea of getting a physician of record to help with his disability application." He opined, "I have every reason to believe that with good medical care he can probably return to his former occupation" and that there could be "a 'new normal' with good function and employment."[98] In an undated letter, Dr. McAnally opined that Mr. D. had "severe neuropathic pain symptoms in both upper extremities that are consistent with a cervical spine problem. They are not inconsistent with more peripheral lesions such as carpal tunnel and cubital tunnel syndromes, but given his overall symptom constellation I think it is entirely likely that his neck is possibly culpable." Dr. McAnally recommended imaging of the cervical spine.[99]

On November 26, 2014, Dr. Werner provided a permanent jury service excusal based on anxiety.[100]

The following are relevant medical records after the date last insured of December 31, 2014:

On October 16, 2015, Mr. D. saw Matthew Peterson, M.D., at Algone Pain Center. He reported bilateral shoulder pain and numbness and pain in the left hand. Dr. Peterson diagnosed Mr. D. with tendinopathy of the shoulder; left shoulder pain; and carpal tunnel

---

[98] A.R. 1020–24.

[99] A.R. 723.

[100] A.R. 1007.

syndrome of the left wrist.  He prescribed cream and instructed Mr. D.'s spouse to perform deep tissue massage.[101]

On December 11, 2015, Mr. D. saw Dr. Peterson.  He reported bilateral shoulder pain.  He underwent right shoulder ultrasound.  Dr. Peterson diagnosed Mr. D. with tendinopathy of the shoulder; right shoulder subacromial impingement; and calcification of the right shoulder tendon.[102]

On February 28, 2018, Mr. D. saw Steve Parker, M.D., at Coho Family Medicine. He reported improved anxiety; no side effects with medications; and chronic bilateral shoulder pain.   On physical examination, Mr. D.'s deep tendon reflexes were 2+ symmetrically in the upper and lower extremities and he had no red or edematous joints. Dr. Parker continued Mr. D.'s current medications of aspirin, clonazepam, and Prilosec.[103]

*Function Reports*

On March 3, 2013, Mr. D. completed a function report.  He reported that he had no problems with personal care; could prepare his own quick meals daily; could ride a lawn mower; do laundry with minimal folding; load the dishwasher; do general straightening around the house; could shop in stores with his wife; and could handle financial matters. He reported that he could ride a motorcycle for an hour, draw for a short time, paint, and watch television.  Mr. D. indicated that his daily routine was to get up in the morning, take a shower, do light housework, watch television, and wait for his wife to return home.  He

---

[101] A.R. 1001–06.

[102] A.R. 1044.

[103] A.R. 1026–29.

reported he did not go to social gatherings due to anxiety. Mr. D. indicated that his conditions affected lifting, reaching, walking, and using his hands. He reported that he could not lift more than 20 pounds, could not reach above his shoulder, and could not walk more than a mile. Mr. D. indicated that his hands tingled and he "drop[ped] things sometimes." He reported using an elbow brace for daily activities. He noted that his wife wrote the function report because the "task of writing is too painful when completing any form that is more than 1 page."[104]

On March 2, 2013, Joyce D., Mr. D.'s spouse, completed a function report. She also reported that Mr. D. got up in the morning, took a shower, did light housework, watched television, and waited for her to return home. She noted that Mr. D. woke up in pain every day and in the middle of the night. She reported that Mr. D. experienced tingling in his fingers. She indicated Mr. D. had no problems with personal care. Joyce D. also reported that Mr. D. could do light housework and lawn mowing with a riding mower. She indicated that Mr. D. went outside once a week; could drive a car, go shopping with her, and handle finances. Joyce D. reported that Mr. D. had a severe fear of being alone when he stopped taking his anxiety medicine. She reported that she watched her husband "strug[g]le everyday to do normal day to day chores" and that he did not sleep well due to chronic arm pain. She stated, "[t]his has been very difficult for him and on top of that he has been told he will have to live with the pain he is in."[105]

---

[104] A.R. 170–77.

[105] A.R. 149–56.

*Testimony on May 4, 2018*

On May 4, 2018, Mr. D. appeared and testified before ALJ Paul Hebda with representation. ALJ Hebda noted that a prior determination was issued on May 22, 2014 and that the U.S. District Court remanded the case back to the agency on March 31, 2017. Mr. D. testified that his grip strength had declined sharply from 2010 to 2014. He commented that he could not grab a glass; could only draw for about 15 to 20 minutes before his hands cramped up; could not raise his arms above his shoulders; could not wash his back or the back of his legs; and could not button his shirts. Mr. D. testified that he could do laundry once a week with pain and that his three fingers on his left hand were constantly numb. He reported that he had anxiety, but also reported that between 2009 and 2014, he did not see a psychologist or psychiatrist "because the doctor gave me those pills, and they seemed to work." He testified that he still had anxiety even when on medication and experienced memory loss, had problems concentrating, and felt dizzy. He also testified that if he didn't take his anxiety medication he went into withdrawal.[106]

Stephen Anderson, M.D., testified as the medical expert. Based on a review of the medical record, Dr. Anderson testified that during the period between January 29, 2009 and December 31, 2014, Mr. D. had chronic overuse syndrome in his shoulders and elbows. He opined that Mr. D. was limited to occasionally lifting and carrying 20 pounds; frequently lifting and carrying 10 pounds; standing or walking for six hours with normal breaks in an eight hour day; pushing and pulling occasionally in the upper extremities;

---

[106] A.R. 780–88.

frequently climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently balancing, stooping, kneeling, and crouching; occasionally crawling; occasionally reaching with the bilateral upper extremities; never reaching overhead; occasionally fingering; never working in concentrated cold, wetness, humidity, excessive noise, and fumes; avoiding exposure to excessive vibration and unprotected heights; and having only occasional exposure to moving and hazardous machinery.[107]

Collette Valette, a clinical psychologist, testified as a medical expert. Based on her review of the record, Dr. Valette noted that Mr. D. had a diagnosis of anxiety and opined that it appeared to be "well-controlled." She opined that Mr. D.'s anxiety did not meet or equal a listing and that he had no functional limitations due to anxiety.[108]

William Weiss testified as the vocational expert. Based on the ALJ's first hypothetical,[109] VE Weiss opined that Mr. D. would not be able to perform his past relevant

---

[107] A.R. 762–68.

[108] A.R. 769–80.

[109] The ALJ's first hypothetical was as follows:

> I have an individual of the claimant's age, education, past relevant work, who can perform light level work [as] defined by the Social Security Administration, but with the following limitations. Occasionally pushing and pulling with the bilateral upper extremities, but with a limit of 10 pounds. I would have frequent climbing of ramps and stairs, balancing, stooping, kneeling, and crouching. I have occasional crawling. No climbing of ladders, ropes, or scaffolds. Regarding manipulative limitations, reaching with the bilateral extremities, upper extremities . . . would be at the occasional level. Overhead reaching above [the] shoulder would be prohibited. We would have frequent handling bilaterally, and occasional fingering and [feeling] laterally. We would have avoidance of concentrated exposure to non-weather-related extreme cold, non-weather-related extreme heat, to [wetness], humidity, and to excessive noise, as well as fumes. Have the avoidance of all exposure to excessive vibration, as well as unprotected heights, and we would only have occasional exposure to moving, and hazardous machinery. As far as concentration, persistence, or pace, we have no limitations regarding those issues.

work.  He opined that Mr. D. would be able to perform other jobs at the sedentary level in the national economy, including call out operator (DOT 237.367-014), surveillance system monitor (DOT 379.367-010), and semiconductor bonder (DOT 726.685-066).  Based on the ALJ's clarification, the RFC was limited to pushing and pulling 10 pounds and frequent handling, VE Weiss testified that Mr. D. could perform some light work, including garment [sorter] (DOT 222.687-014), egg sorter or egg handler (DOT 529.687-074), and basket filler (DOT 529.687-010).  VE Weiss also testified, "the safest would be of course, the sedentary positions within the parameters."[110]

## IV.    DISCUSSION

Mr. D. is represented by counsel.  In his opening brief, Mr. D. alleges that the ALJ's decision is not supported by substantial evidence and is the product of reversible errors of law because the ALJ: (1) failed to appropriately consider Mr. D.'s activities and subjective complaints; (2) erroneously weighed the opinion evidence; and (3) was improperly and unconstitutionally appointed.  He seeks remand for calculation of benefits or in the alternative, remand for a de novo hearing before a new ALJ and a new decision.[111]  The Commissioner disputes Mr. D.'s assertions.[112]  The Court addresses each of Mr. D.'s assertions in turn:

---

A.R. 791–92.

[110] A.R. 789–96.

[111] Docket 15 at 1, 10–17.

[112] Docket 16 at 2–17.

A.    Jason D.'s Activities and Subjective Complaints

Mr. D. asserts that the ALJ did not account for "struggles with activity" and therefore did not provide clear and convincing evidence to support a finding that Mr. D.'s "subjective complaints are undermined."  He also asserts that the ALJ repeatedly cited to Mr. D.'s work as a tattoo artist in support of his decision, "despite this Court's previous discussion of this topic."[113]

1. *Legal Standard*

Credibility determinations are the province of the ALJ.[114]  An ALJ engages in a two-step analysis to determine the credibility of a claimant's testimony regarding subjective pain or symptoms.[115]  In the first step, the claimant "need not show that [his] impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom."[116]  On this point, the ALJ determined that Mr. D.'s status post SLAP repair of the right shoulder; status post left elbow ulnar nerve transposition; and status post right elbow debridement with epicondyle release were severe impairments.[117]

In the second step, the ALJ evaluates the intensity and persistence of a claimant's

---

[113] Docket 15 at 12.

[114] *Fair v. Bowen,* 885 F.2d 597, 604 (9th Cir. 1989).

[115] *Garrison v. Colvin,* 759 F.3d 995, 1011 (9th Cir. 2014); *Treichler v. Comm'r of Soc. Sec. Admin.,* 775 F.3d 1090, 1102 (9th Cir. 2014).

[116] *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (*superseded by statute,* 20 C.F.R. §§ 404.1529 (c)(3), 416.929 (c)(3), *claims after March 27, 2017*).

[117] A.R. 737.

symptoms by considering "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him]."[118]  If a claimant meets the first test and there is no evidence of malingering, the ALJ may reject testimony regarding the claimant's subjective pain or the intensity of symptoms, but must provide "specific, clear and convincing reasons for doing so."[119]  The ALJ is required to "specifically identify the testimony from a claimant she or he finds not to be credible and explain what evidence undermines [that] testimony"; general findings are insufficient.[120]  An ALJ may consider at least the following factors when weighing the claimant's credibility: claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between his testimony and his conduct, claimant's daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains.[121]  If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing.[122]

 2.  *Analysis*

 In this case, the ALJ discounted Mr. D.'s statements concerning the intensity,

---

[118] 20 C.F.R. § 416.929(a).

[119] *Smolen,* 80 F.3d at 1281; *Ghanim v. Colvin,* 763 F.3d 1154, 1163 (9th Cir. 2014).

[120] *Treichler,* 775 F.3d at 1102 (quoting *Holohan v. Massanari,* 246 F.3d 1195, 1208 (9th Cir. 2001); *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995)).

[121] *Thomas v. Barnhart,* 278 F.3d 947, 958–59 (9th Cir. 2002) (internal quotations and citations omitted).

[122] *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600 (9th Cir. 1999).

persistence, and limiting effects of his symptoms on two grounds: (1) Mr. D.'s statements were not consistent with the record, and (2) Mr. D.'s functional limitations were not as significant and limiting as he alleged.[123]

The ALJ noted that Mr. D. was "still doing tattoos in 2013, suggesting his symptoms were not severe."[124] This observation conflicts with Mr. D.'s testimony that his grip strength declined sharply from 2010 to 2014; he could only draw for 15 to 20 minutes; and that his fingers in his left hand were constantly numb.[125] Mr. D. reported in a letter dated August 27, 2013, that he could only work four to five hours and then needed to take two or three days to rest his arms and hands.[126] He reported to Dr. McAnally in 2014 that he had to close his tattoo business because his hands were "too shaky."[127] However, in the treatment records, Mr. D. continued to report to Dr. Clyde that he was training and/or working as a tattoo artist from 2010 to 2014.[128] Dr. Clyde recommended that Mr. D. continue with his tattoo work in a health questionnaire during the relevant period.[129] Dr. Schroeder gave Mr. D. an upper extremity impairment rating of 16% and on the same date, noted that working as a tattoo artist seemed "to be a

_____

[123] A.R. 741–42.

[124] A.R. 741.

[125] A.R. 780, 783.

[126] A.R. 192–93.

[127] A.R. 1020–24.

[128] *e.g.,* A.R. 585, 694. However, there was no evidence of income after 2009. A.R. 35–36, 737, 967.

[129] A.R. 585.

reasonable pursuit."[130]  And, throughout the record, Dr. Clyde consistently opined that while Mr. D. could not perform his past work as a carver, he was able to perform modified work.[131]  Although another ALJ may have evaluated the same evidence and determined that Mr. D.'s tattoo work during the relevant period was a failed work attempt, the ALJ here made specific findings justifying his decision supported by substantial evidence in the record and "our role is not to second-guess that decision."[132]

In the Ninth Circuit, the failure to give maximum or consistent effort during physical examinations is a clear and convincing reason to discount a claimant's statements.[133]  An "ALJ is permitted to consider lack of treatment in his credibility determination."[134]  And, a finding, supported by the record, that a claimant failed to give maximum or consistent effort during a physical capacity evaluation is a "compelling" reason for an ALJ to reject subjective testimony.[135]  Here, ALJ Hebda pointed out that Mr. D. showed poor effort on testing and had a "disability conviction despite being told he could likely work in some fashion with appropriate treatment."[136]  The ALJ determined

---

[130] A.R. 475–85.

[131] *e.g.,* A.R. 437, 442, 444.

[132] *Fair v. Bowen,* 885 F.2d 597, 604 (9th Cir. 1989); *Lingenfelter,* 504 F.3d at 1039–1040 (reversing credibility determination as contrary to medical evidence, not supported by daily activity evidence, and improperly based on failed attempt to work).

[133] *Thomas,* 278 F.3d at 959.

[134] *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005).

[135] *Thomas,* 278 F.3d at 959.

[136] A.R. 741–42.

that Mr. D.'s alleged mental impairments were not supported in the record as Mr. D. "admitted that he did not seek counseling because his medication for anxiety was working."[137]   Further, the ALJ noted that although Mr. D. alleged side effects from medication affecting his memory and concentration, the medical record by Dr. McAnally from June 2014 "reflected no problems with concentration, affect was normal, and attention span was intact."[138]

The ALJ incorrectly pointed out that Mr. D. sought treatment for numbness in his right hand but not his left hand in May 2013.  In Dr. Gritzka's evaluation, Mr. D. reported that since February 2013, he experienced "numbness in my right hand with continued numbness in my left hand even after surgery, severe pain in my neck and locking of both elbows."[139]   However, the ALJ accounted for Mr. D.'s hands bilaterally in the RFC. Because the RFC included limitations of frequent handling and occasionally fingering and feeling bilaterally, any misstatement by the ALJ regarding a lack of numbness in the left hand is harmless.[140]  The ALJ's above findings are reflected in the record and support his conclusion that Mr. D.'s statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the record evidence.

An ALJ can discount a claimant's credibility when daily activities demonstrate an

---

[137] A.R. 741.

[138] A.R. 741–42.

[139] In January 2014, Dr. Gritzka noted "diminished sensory perception to both light touch and sharp point in a glove like distribution involving both hands to about mid forearm bilaterally."  A.R. 208.  Mr. D. reported tingling and numbness in June 2014.  A.R. 1022.

[140] A.R. 739; *see Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015).

inconsistency between what the claimant can do and the degree of disability alleged.[141]

Here, the ALJ stated that Mr. D.'s "activities were quite involved." He noted that Mr. D. was "capable of light housework, such as laundry, loading the dishwasher, mowing the lawn, and straightening up around the house" as well as handling personal care without difficulty, preparing simple meals, driving, shopping in stores, managing financial matters, walking one mile, finishing tasks, and following directions very well.[142] Mr. D.'s daily activities contradict his testimony. Mr. D. testified that he had pain loading laundry "[t]he whole time while I am doing it, and after I am doing it." He testified that he was in pain all day, every day.[143] Mr. D. also testified that he could not button his shirt or put on a shirt without assistance, but he noted no problems with personal care in his 2013 function report.[144]

The Court finds that the ALJ's assessment of Mr. D.'s subjective complaints is free of reversible error. Even if one of the reasons provided could be found inadequate, sufficient evidence supports the ALJ's credibility determination.[145]

B. Medical Source Opinions

Mr. D. alleges that the ALJ improperly weighed the medical opinion evidence. He asserts that the ALJ failed to provide legally sufficient reasons for rejecting Dr. Gritzka's

_____

[141] *Molina v. Astrue,* 674 F.3d 1104, 1112–13 (9th Cir. 2012).

[142] A.R. 742.

[143] A.R. 783.

[144] A.R. 171, 781–82.

[145] *See Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1197 (9th Cir. 2004).

opinion and that the ALJ's "reasons for weighting the opinion evidence as he does do not comprise substantial evidence for the weighing or for the RFC."[146]

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[147] Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[148] The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."[149]

In the Ninth Circuit, "[t]o reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."[150] Even "if a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons

---

[146] Docket 15 at 13–15.

[147] 20 C.F.R. § 404.1527(c). This section applies to claims filed before March 27, 2017.

[148] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[149] 20 C.F.R. §§ 404.1527(c)(2) (for claims filed before March 27, 2017).

[150] *Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017) (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)).

supported by substantial evidence."[151]  This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."[152]  And, the "opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician."[153]

Factors relevant to evaluating any medical opinion include:  (1) the consistency of the medical opinion with the record as a whole; (2) the physician's area of specialization; (3) the supportability of the physician's opinion through relevant evidence; and (4) other relevant factors, such as the physician's degree of familiarity with the SSA's disability process and with other information in the record.[154]  An ALJ may reject the opinion of a doctor "if that opinion is brief, conclusory, and inadequately supported by clinical findings." However, "[t]he ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."[155]

Here, the ALJ accorded little weight to Dr. Gritzka's opinion that Mr. D. was only capable of sedentary work.  Dr. Gritzka's sedentary work opinion was contradicted by testifying physician Dr. Anderson's opinion that Mr. D. was capable of light work with

---

[151] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

[152] *Reddick*, 157 F.3d at 725 (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

[153] *Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995).

[154] 20 C.F.R. §§ 404.1513a(b), 404.1527(c)(2).  These sections apply to claims filed before March 27, 2017.  *See* §§ 404.614.  Mr. D. filed his application on or about January 10, 2013. A.R. 128.

[155] *Reddick v. Chater,* 157 F.3d at 725.

limitations, including frequently handling and occasionally fingering.[156]   Dr. Gritzka's opinion was also contradicted by examining doctor Dr. Gevaert's opinion that Mr. D. could perform light-medium work as long as the work did not involve repetitive activity and Dr. McAnally's opinion that Mr. D. could likely achieve good function and employment with appropriate medical care.[157]   Therefore, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Gritzka's opinion.[158]

The ALJ is responsible for resolving conflicts in medical testimony and resolving ambiguity. "Determining whether inconsistencies are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount [physicians' opinions] falls within this responsibility."[159]   In this case, ALJ Hebda provided the following reasons: (1) Dr. Gritzka's sedentary work opinion was "not supported by the overall evidence showing [Mr. D.] was doing fairly well until this examination";  (2) the stand/walk limitations were not supported by a diagnosis; (3) the extreme limits on Mr. D's use of hands was inconsistent with [Mr. D.]'s ability to do tattoos; an(d 4) "earlier evidence of poor effort on examination . . . might [have] accounted for the inconsistent findings at this evaluation compared to other evaluations."[160]

---

[156] A.R. 742–44; 766–77.

[157] A.R. 343, 742–44; 1024.

[158] *Revels,* 874 F.3d at 654.

[159] *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 603 (9th Cir. 1999).

[160] A.R. 743–44.

The ALJ's above reasons were supported by substantial evidence. Dr. Gritzka did not address standing or walking in his examination on January 29, 2014.[161] It is unclear how much time Mr. D. spent working as a tattoo artist,[162] but the activity involves the use of one's hands. Additionally, no physician in this case opined that Mr. D. could not work at all, including Dr. Gritzka.[163] Although the RFC included light work with limitations, it specifically limited Mr. D. to frequent handling and occasionally fingering and feeling with the bilateral upper extremities.[164] And, in any event, the representative occupations listed in the ALJ's decision as work Mr. D. could have performed were all sedentary.[165]

For the foregoing reasons, the ALJ provided specific and legitimate reasons supported by substantial evidence for rejecting Dr. Gritzka's sedentary work restriction opinion.

C. The ALJ's Legal Authority

Mr. D. asserts that at the time of his hearing, ALJ Hebda was "an inferior officer who was not constitutionally appointed." He requests remand to a new ALJ.[166] The

---

[161] A.R. 203–10.

[162] Although Mr. D. reported performing work as a tattoo artist at the previous hearing on December 4, 2013, there was no further evidence of income posted after 2009. A.R. 35–36, 737, 967.

[163] e.g., A.R. 340–43, 366, 424, 435, 437, 442, 444, 446, 467, 471, 664, 700, 716–21; 1020–24. However, Dr. Werner did opine that Mr. D. should be excused from jury service due to "anxiety issues and social anxiety disorder." A.R. 1007.

[164] A.R. 739.

[165] A.R. 746 (DOT 237.367-014, DOT 379.367-010, DOT 726.885-066).

[166] Docket 15 at 16.

Commissioner argues that the "Court should dismiss [Mr. D.]'s Appointments Clause argument because he never raised it to the Agency in the course of the administrative proceedings.[167]

On June 21, 2018, the United States Supreme Court held that the SEC's ALJs are "Officers of the United States" within the meaning of the Appointments Clause and "[o]nly the President, a court of law, or a head of department" may appoint an officer. In that case, the Supreme Court held that the plaintiff had timely challenged the SEC ALJ's appointment whem he contested the validity of the appointment before the Commission and continued pressing that claim on appeal to the SEC and then to the court.[168] In a previous decision, the Supreme Court held that a party "who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief."[169] However, Appointments Clause challenges are nonjurisdictional and may be waived or forfeited.[170] Although the Supreme Court did not specifically address the constitutional status of ALJs in the SSA, the Commissioner ratified the appointments of the SSA ALJs as of July 16, 2018.[171]

---

[167] Docket 16 at 6.

[168] *Lucia v. S.E.C.,* 138 S. Ct. 2044, 2051 (2018) (citing U.S. Const. art. II, § 2, cl. 2).

[169] *Id., Ryder v. United States,* 515 U.S. 177, 182 (1991) ("one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief").

[170] *Freytag v. Comm'r*, 501 U.S. 868, 893–94 ("Appointments Clause claims, and other structural constitutional claims, have no special entitlement to review" and may be waived or forfeited for failure to raise them at trial) (Scalia, J., concurring in part and concurring in the judgment).

[171] SSR 19-1p. Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the Social Security Administration. *See* 20 C.F.R.

Here, Mr. D. did not raise the validity of the ALJ's appointment at the administrative level or at any time before his opening brief to this Court. Additionally, he was represented by counsel at his hearing on May 4, 2018 before ALJ Hebda.[172] While the Ninth Circuit has not directly addressed *Lucia* in the social security context, it has confirmed that generally, a claimant must exhaust all issues before the ALJ in order to preserve judicial review.[173] Mr. D. cites *Sims v. Apfel* in his brief for the proposition that "neither statute nor regulation requires issue exhaustion" at the Appeals Council level.[174] However, in *Sims*, while the Supreme Court explained that claimants need not "exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues," the Court explicitly noted that "[w]hether a claimant must exhaust issues before the ALJ is not before us."[175] Further, other district courts in the Ninth Circuit have not extended the *Sims* rule to permit a litigant to raise an issue in federal court that had not been presented to

---

402.35(b)(1).

[172] A.R. 724–25, 780–88.

[173] *Shaibi v. Berryhill,* 883 F.3d 1102, 1109 (9th Cir. 2017) ("In light of the [Supreme] Court's express limitation on its holding in *Sims*, we cannot say that that holding is 'clearly irreconcilable' with our decision in *Meanel* and *Meanel* therefore remains binding on this court with respect to proceedings before an ALJ."). The Court in *Meanel* held that claimants represented by counsel must raise all issues at their administrative hearings to preserve those issues on appeal. 172 F.3d 1111, 1115 (9th Cir. 1999).

[174] Docket 22 at 14 (citing *Sims v. Apfel,* 530 U.S. 103, 111 (2000) (plurality opinion).

[175] 530 U.S. at 107, 111.

the ALJ.[176]  Therefore, to the extent *Lucia* applies to Social Security ALJs, Mr. D. "forfeited the issue by failing to raise it during his administrative proceedings."[177]

For the foregoing reasons, Mr. D. forfeited his claim that the ALJ was not properly appointed under the Constitution for the purposes of federal court review.

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are free from legal error and supported by substantial evidence in the record.  Accordingly, IT IS ORDERED that Mr. D.'s request for relief at Docket 15 is DENIED as set forth herein, the Commissioner's final decision is AFFIRMED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 10th day of April, 2020 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[176] *Dierker v. Berryhill,* 2019 WL 246429, at *4 (S.D. Cal. Jan. 16, 2019), *report and recommendation adopted,* 2019 WL 446231 (S.D. Cal. Feb. 5, 2019); *Byrd v. Berryhill,* 2019 WL 95461, at *6 n.10 (E.D. Cal. Jan. 3, 2019); *Samuel F. v. Berryhill,* 2018 WL 5984187, at *2 n.6 (C.D. Cal. Nov. 14, 2018).

[177] *James A. v. Saul,* 2019 WL 4600940, at *15 (N.D. Cal. September 23, 2019) (internal citations and quotations omitted).